UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT KING,

              Plaintiff,

vs.                          Case No.  3:04-cv-56-J-33MCR

ESMET, INC.,

              Defendant.
_____/


**ORDER**

    This cause comes before the Court pursuant to Defendant Esmet's Motion for Final Summary Judgment (Doc. # 66), filed on September 19, 2006.  Defendant United States filed its Opposition to Defendant Esmet's Motion (Doc. # 69) on October 3, 2006. Plaintiff King's Response to Defendant Esmet's Motion (Doc. # 70) was also filed on October 3, 2006.  With leave of Court, Esmet's Reply Memorandum (Doc. # 76) was filed on November 13, 2006.  Upon careful consideration and for the reasons stated herein, Esmet's Motion for Final Summary Judgment is due to be DENIED.

**I.  STANDARD OF REVIEW**

    Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1989)("One of the

principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . .") . Entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. Where there is a "complete failure of proof concerning an essential element of the nonmoving party's case," all other facts presented by that party are rendered immaterial. Id. at 323.

The movant bears the responsibility for demonstrating the basis for the summary judgment motion. Id. A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of

-2-

material fact that should be decided at trial.  <u>Hickson Corp. v. N.</u>
<u>Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004)(citing
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving
party must then 'go beyond the pleadings,' and by its own
affidavits, or by 'depositions, answers to interrogatories, and
admissions on file,' designate specific facts showing that there is
a genuine issue for trial." <u>Jeffrey v. Sarasota White Sox, Inc.</u>,
64 F.3d 590, 593-94 (11th Cir. 1995)(citing <u>Celotex</u>, 477 U.S. at
324).  If there is a conflict between the parties' allegations or
evidence, the non-moving party's evidence is presumed to be true
and all reasonable inferences must be drawn in the non-moving
party's favor.  <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161,
1164 (11th Cir. 2003).

If a reasonable fact finder evaluating the evidence could draw
more than one inference from the facts, and if that inference
introduces a genuine issue of material fact, the court should not
grant summary judgment.  <u>Samples *ex rel.* Samples v. City of</u>
<u>Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta Iron</u>
<u>& Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856
(11th Cir. 1988)).

II.  <u>**BACKGROUND**</u>

The relevant undisputed facts are as follows.  The instant
suit arose when Plaintiff was injured on April 16, 2003, while

conducting dynamic stress tests on lifelines used aboard a United States Navy vessel.  Plaintiff's employer, Maritime Mechanical Services, had been retained by the Navy to conduct these tests for the lifelines used aboard the USS Dewert.  As part of the tests, the vessel's lifelines were connected to Electroline end termination sockets manufactured by Esmet, and the bottom line was attached to a 3,000 pound weight.  A crane lifted the socket-lifeline assembly connected to the test weight so that the weight was elevated a few inches above the ground.  The end termination socket failed, causing the weight to fall.  The 3,000 pound weight struck and crushed King's right leg.  As a result, King's leg had to be amputated below the knee.

King filed suit against Esmet and the United States on January 30, 2004.  His Amended Complaint (Doc. # 9) was filed on September 9, 2004.  King's Amended Complaint contains three claims.  The first and second respectively allege strict liability and negligence as to Esmet.  The third claim alleges negligence on the part of the United States.

**III. <u>ANALYSIS</u>**

Esmet argues that it is entitled to summary judgment in this case pursuant to the military/government contractor defense.  Under this defense,

> [l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the Unites States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and

-4-

(3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Boyle v. United Techs. Corp., 487 U.S. 500, 512 (1988). The defense was intended to provide military contractors with the same relief from liability as the government itself enjoys when the contractor manufactures a product according to a government-specified design. One of the considerations behind this defense is that "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." Id. at 507. The creation of this defense reflects the reasoning that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function" that "often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." Id. at 511.

If Esmet is entitled to the military contractor defense, then that defense would protect the company from liability in this suit. To determine whether the military contractor defense entitles Esmet to summary judgment as a matter of law, this Court now examines the applicability of the considerations laid forth in Boyle.

A.   **Whether the United States Approved Reasonably Precise Specifications**

The first consideration is whether the United States approved reasonably precise specifications for the design of Esmet's Electroline socket.  For the reasons stated here, the Court finds that a genuine issue of material fact exists as to the United States' involvement in the design of the socket and it is on this basis that Esmet's Motion for Summary Judgment must fail.

The condition that the United States approved reasonably precise specifications was created to "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." Boyle, 487 U.S. at 512.  In this circuit, government approval of reasonably precise specifications has been found where "the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved." Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311, 1320 (11th Cir. 1989)(citing Smith v. Xerox Corp., 866 F.2d 135, 138 (5th Cir. 1989)).  The defense is not available when the Government acquisition is a mere purchase of a stock product.  Id.  In examining the Government's level of involvement with the design, Courts have considered whether the design was the result of "continuous back and forth" between the contractor and the Government, or a mere "rubber stamp." See id. (citing Trevino v. Gen. Dymamics Corp., 865 F.2d 1474, 1480 (5th Cir. 1989)).

In this case, summary judgment is not appropriate because a factual dispute exists as to whether the government approved reasonably precise specifications for the Electroline socket. Esmet points to the deposition testimony of Kenneth Brayton, the Navy's top civilian authority regarding technical aspects of lifelines and fittings, to support its claim that "[t]he Navy, not Esmet, developed and approved the military specifications for the sockets, and Esmet is required to conform to those specifications." (Doc. # 66, p. 5 (citing to Brayton Depo. at 51:8-15.))

Esmet also asserts that "it is indisputable that all of Esmet's sockets are designed and manufactured in compliance with, and in conformance to, the USA's military specifications, Mil Spec 56W44-PR-8508." (Id. at 6 (citing O'Donnell Aff. at ¶ 11.)) James Ripple's Affidavit, according to Esmet, also provides support for the claim that the government was involved in the development of reasonably precise specifications for the socket. Ripple, who is Esmet's President and Chief Executive Officer, "confirmed that the USA, through the Navy, prepared and approved Mil Spec 56W44-PR-8508 for the sockets, not Esmet." (Id. at 6 (citing Ripple Aff. at ¶¶ 2, 4, & 5.)) Dr. William O'Donnell, Esmet's engineering expert, has concluded that Mil Spec 56W44-PR-8508 "constitutes reasonably precise specifications for Esmet's sockets, including the subject socket." (Id. at 6 (citing O'Donnell Aff. at ¶ 10.))

Esmet additionally cites to the deposition testimony of the socket's inventor, Mr. Charles Shaw, who testified that Esmet "went with their [the Navy's] requirements" for the sockets, and the Navy specified the material, the finishes, and the anodizing for the sockets. (Id. at 7 (citing Shaw Depo. at 23:15-16, 16:4-17:6.)) Esmet also states that J.J. McMullen, the United States' "de facto engineering department, worked with Mr. Shaw on the design and development of the sockets for use with the Navy's half inch lifelines." (Id. at 8 (citing Shaw Depo. at 90:15-91:9.))

The United States views its level of involvement in the creation of the Electroline socket differently, and states that its involvement did not rise to the level required for the application of the military contractor defense. The United States argues that Charles Shaw invented an end termination device for aramid fiber, or Kevlar, ropes long before Esmet was approached by the Navy regarding its need for such a device. (Doc. # 69, pp. 1-2 (citing Shaw Depo. at 4:18-5:7, 6:19-8:2, 9:11-10:2, 19:11-20:2.)) In fact, the United States notes that it was not until after a supplier of aramid fiber lines recommended Esmet and Shaw's Electroline socket as the Navy that Shaw began to market his invention to the government. (Id. at 2 (citing Shaw Depo. at 19:8-19:10.)) When the Navy decided to use the Electroline fittings, it hired J.J. McMullen to consult with Shaw to change "the dimensions and materials of the existing device to fit the specific aramid

fiber rope the Navy uses, but no change was made to Mr. Shaw's patented idea." (Id. at 2 (citing Shaw Depo. at 20:14-21:16, 14:10-15:21, 17:12-18:6, 21:22-22:10.)). Shaw testified that when he originally patented his design, it was made "generic in the sense that it was adaptable to use in various sizes, to be made of various materials, and coated with various substances." (See Shaw Depo. At 88:16-21.)

Not only does the United States argue that its involvement in the overall development of the Electroline fitting was "inconsequential" based on these facts, it also argues that it was not at all involved with the soft compression design, which was "the root of the problem." Shaw patented this portion of his design, which is "an external wedge-- as opposed to the internal wedge used in wire rope termination devices-- which uses the elasticity of that thin jacket of protective material to carry a soft compressive load that does not damage the more brittle aramid fibers." (Doc. # 69, p. 2 (citing Shaw Depo. at 8:21-9:1, 10:3-7.))

According to the United States, subsequent testing of the fitting that failed in this case indicated that the interior of the fitting was corroded, which affected the fitting's grip on the lifeline and led directly to the part's failure. (Doc. # 69, pp. 4-5 (citing Lab Report # 03NN02727, Exhibit J.)) As "the requirements of 'reasonably precise specifications' and conformity

with them refer to the particular feature of the product claimed to be defective," the United States argues that its general involvement with the dimensions is even less significant, because it was not involved with the development of the soft compression design.  See Gray v. Lockheed Aeronautical Sys. Co., 880 F. Supp. 1559, 1566 (N.D. Ga. 1995), cert. granted, vacated on other grounds, 524 U.S. 924 (1998), rev'd on other grounds, 155 F.3d 1343 (11th Cir. 1998)(citing Bailey v. McDonnell Douglas Corp., 989 F.2d 794, 799 (5th Cir. 1993)(citing Boyle, 487 U.S. at 512)).

In regards to the military contractor defense, the Supreme Court has made clear that "whether the facts establish the conditions for the defense is a question for the jury." Boyle, 487 U.S. at 514.  On this summary judgment motion, the Court looks not to whether the Esmet has shown sufficient facts to establish the conditions for the military contractor defense; rather, it looks to whether it is entitled to summary judgment as a matter of law based on that defense.  Where, as here, there is a dispute as to whether the facts demonstrate that the United States approved reasonably precise specifications for the Electroline fitting, summary judgment is inappropriate and the jury must decide whether the facts support the application of this defense.  Because it finds that a genuine issue of material fact exists as to the first Boyle condition, the Court need not reach the remaining Boyle conditions.

IV.  **CONCLUSION**

Summary judgment in this case is not appropriate because a genuine issue of material fact exists as to Esmet's ability to meet the first Boyle condition for the use of the military contractor defense.   For this reason, Esmet's Motion for Final Summary Judgment is due to be denied.

Accordingly, it is now

**ORDERED, ADJUDGED** and **DECREED:**

Defendant Esmet's Motion for Final Summary Judgment (Doc. # 66) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 10th day of December, 2006.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record